Filed 7/19/22  In re A.T. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re A.T., a Person Coming Under the Juvenile Court Law. | |
| | D079980 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. J520826) |
| Plaintiff and Respondent, | |
| v. | |
| M.D., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Browder A. Willis III, Judge.  Affirmed.

Amy Z. Tobin, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel, for Plaintiff and Respondent.

Infant A.T. was detained at birth after his umbilical cord tested positive for amphetamine and methamphetamine, among other substances, and M.D. (Mother) tested positive for amphetamine and methamphetamine. Mother appeals the juvenile court's order following a contested adjudication and disposition hearing in which the court removed A.T. from Mother's care and placed him in a licensed foster home. Mother contends there was not substantial evidence to support the juvenile court's removal order and there were reasonable alternative means to protect A.T. We disagree and affirm the order.

## BACKGROUND

A.  *Family History*

Mother and L.T. have known each other for over 10 years. L.T. (Father) was determined to be A.T.'s biological father.[1] They are not married, but Mother and three other children commuted between the central valley of California and Father's home in Mexico every week or two before A.T. was born. Mother has two older children who reside with Mother's adult daughter in another state.

Mother learned she was pregnant with A.T. when she was five and a half months pregnant. She reported having one prenatal examination in the central valley of California and one at a clinic in Mexico. She said she was tested for preeclampsia at a San Diego hospital and had an emergency caesarian section at 32 weeks.

---

[1]  Father initially denied being A.T.'s biological father, saying he believed he was being extorted. Mother gave inconsistent stories about A.T.'s paternity, but later admitted that she said L.T. was not A.T.'s father because she was upset with a prior social worker. A paternity test confirmed L.T. was A.T.'s biological father.

After A.T. was born at the end of July 2021, he received care in a neonatal intensive care unit (NICU). The Agency received a report that Mother had no prenatal care and she tested positive for amphetamines at birth. A.T.'s umbilical cord tested positive for amphetamines and methamphetamines, as well as several other substances that could not be accounted for by medications provided to Mother in the hospital. Mother denied using methamphetamine, but said she occasionally smoked marijuana before she learned she was pregnant. She took some medications during her pregnancy for preeclampsia. She said she smoked "a few tokes" from a pre-rolled "blunt" about a month before delivery. She did not believe there was methamphetamine in the blunt, but she had no other explanation. Mother said she was willing to do "whatever the agency wants," but did not believe she needed substance abuse treatment.

A few days after A.T.'s birth, the Agency received a report with concerns that Mother could not care for the newborn child. The reporting party said that Mother was known in the community as a substance user and that two of her children were previously removed by another county. The reporting party said there was no gas or electricity in the home for several months because the family could not pay their bills. The reporting party said a one-year-old sibling was sick and could not walk and that two older siblings did not attend school. Because these children were outside the jurisdiction, a cross report was made to the International Liaisons Office.

B. *Initiation of Dependency Proceedings*

The Agency filed a petition on August 11, 2021, alleging that A.T. was a child within the jurisdiction of the juvenile court under Welfare and

Institutions code section 300, subdivision (b),[2] because he suffered or was at a substantial risk of suffering serious physical harm or illness due to his positive test for amphetamine and methamphetamine and Mother's positive test for methamphetamine and amphetamine.

In the detention report, the Agency reported that Mother historically used substances during her pregnancies and evaded Agency contacts. Mother tested positive for marijuana when she delivered a previous child. The Agency was concerned that A.T. would be exposed to Mother's drug use and that his basic needs could be neglected.

Prior allegations of general neglect regarding a sibling approximately a year earlier were closed as inconclusive by another county. That child was also born premature and was placed in the NICU. Mother had difficulty visiting consistently due to health and transportation problems. She bonded well with the child when she visited. Later, there were concerns about whether Mother was following up with important medical care for the child. General neglect allegations regarding Mother's older children missing school or being home alone were evaluated out by another county approximately 10 years earlier.

The Agency did not believe Mother was appropriate for voluntary services. A social worker advised Mother in 2018 to meet with a substance abuse specialist to address her drug use. Mother said in early August 2021 that she contacted a substance abuse specialist, but she had not completed screening at the time of the report. Mother did not admit to using methamphetamine or acknowledge a need for treatment.

---

[2]     All further statutory references are to the Welfare and Institutions code.

C.    *Detention Hearing*

Mother appeared remotely at the detention hearing on August 12, 2021.  She disrupted the proceedings by talking over the judge, disputed comments about L.T. being A.T.'s father, and stated she was recording the proceeding, which the court informed her was a violation of the confidentiality of the proceedings.  When Mother continued to be disruptive after several warnings, the court disconnected her and gave her attorney an opportunity to contact her.  Mother was suspicious of the proceedings and hung up on the attorney.  When court reconvened, Mother said she was still recording the proceedings and intended to turn the recordings in to the police.  The court continued the hearing to the afternoon and ordered Mother to appear in person.  She did not do so.

Because there was a concern about whether Mother resided in Mexico, the court took temporary emergency jurisdiction and found that the Agency made a prima facie showing that A.T. was a child described by section 300, subdivision (b).  The court commented that the child was born premature, weighing just over three pounds.  Mother's toxicology screen was positive for amphetamine and the child's toxicology screen was positive for methamphetamine and amphetamine.  There was also a report that Mother was a long-time substance abuser and lived in unsafe conditions.  The court found that removal of A.T. from his parents was necessary due to a substantial danger to the physical health of the child and there were no reasonable means to protect the child's physical or emotional health without removal from the parents' custody.  The court ordered A.T. detained out of the home.

5

D.    *Jurisdiction and Disposition Period*

The social worker authorized supervised visits for Mother in the NICU, but Mother did not visit.  She said she watched A.T. on the NICU monitor and called to check on him daily.

The social worker requested that Mother drug test on August 26, 2021. Mother did not do so.  She later said she was confused about the date.  The social worker requested that Mother complete a hair follicle test by September 3, 2021.  Mother agreed, but did not do so.

Mother denied being a drug addict.  Her parents were drug addicts and were not involved in her life as parents.  She was raised by a grandmother and she experienced physical, sexual, and emotional abuse.  She said she would not put her children in that position.

Mother denied being involved in a child welfare case in the past, but admitted that she had referrals.  She thought A.T. would be safe in her home and denied the need for services.  However, she said she was willing to participate in recommended services.  Mother said she did not contact a substance abuse specialist in August due to transportation difficulties and she was unable to call.

The social worker encouraged Mother to participate in voluntary services to prevent delays in reunification.  She explained the Agency would recommend substance abuse treatment, random drug testing, parenting classes, and individual counseling.  Mother wanted A.T. placed with her and said she would participate in services when A.T. was in her care.  The social worker submitted therapy referrals for Mother and submitted a request to locate a drug testing site and parenting classes for Father in Mexico through the International Liaisons Office.

The parents participated in a child and family team meeting on September 10, 2021. Mother continued to deny using methamphetamine and stated that the drug tests at the hospital did not make sense. She had not followed through with drug testing and said it was unnecessary because she does not use drugs. She thought if she took a drug test it would amount to admitting that she has a drug problem. The Agency and Mother's supports encouraged her to cooperate, but Mother pushed back saying "what's the point." The social worker submitted requests for substance abuse treatment, drug testing, parenting classes, and therapy services in Mexico.

At the jurisdiction and disposition hearing, the parents requested a trial on the truth of the allegations and disposition. Mother asked for placement of the child with her and Father in Mexico and for family maintenance services to be provided in Mexico. Since Father is unable to travel to the United States, he requested visits at the border if A.T. were not placed with them. The court assumed subject matter jurisdiction of the case because authorities from the Republic of Mexico did not respond to notifications about the case. The court set the matter for a contested adjudication and disposition hearing.

A.T. was placed in a licensed foster home after his discharge from the hospital. The caregiver reported in late September and early October 2021 that communication with the parents was difficult due to the use of an international phone number. Mother missed visits and was not calling or asking for video calls. The caregiver tried connecting with the parents through a social media platform. The social worker encouraged Mother to attend scheduled visits and made a referral for Mother to visit at a family visitation center. However, Mother frequently canceled, did not appear, or was late to visits.

In late October 2021, the social worker again encouraged Mother to begin participating in services, including in-person substance abuse treatment, to prevent delays in reunification. The social worker confirmed the Mother had not followed through with prior drug tests and again requested that she complete a hair follicle test. Mother did not do so.

Mother did not test as requested in November or December 2021. She picked up referral information only a week before the scheduled contested hearing, even though it had been available for two months.

The Agency remained concerned that Mother used methamphetamine while pregnant resulting in positive toxicology tests for both her and A.T. Mother did not demonstrate insight into the protective issues, continued to deny substance abuse, did not comply with repeated requests for testing, and had not started any services. Her visits with A.T. were inconsistent.

E.      *Contested Adjudication and Disposition Hearings*[3]

The court received the Agency's detention report, the jurisdiction report and two addendum reports.

The social worker testified on cross examination that Mother's interactions with A.T. were loving and appropriate during visits.

Father denied knowing that Mother used illegal substances. He said he saw Mother two or three times a month when she was pregnant with A.T. and she lived with him after this case began. Father described Mother as a great mother and said she did not need a parenting class. He said he would obey court orders, support Mother in getting into a treatment program, or

---

[3]     The contested adjudication and disposition hearing was continued to December to complete Father's paternity testing. It commenced virtually on December 17, 2021, but was suspended due to communication difficulties. The hearing was completed on January 20, 2022.

take courses to recognize when someone is under the influence of drugs.  He said they have electricity and running water at his home.

Mother testified on her own behalf.  Mother stated she sought prenatal care, but did not discover she was pregnant until she was over five months pregnant.  She said she had a prenatal check-up in the central valley of California.

Mother had no explanation for why she and A.T. tested positive for methamphetamines.  She denied using methamphetamine or alcohol.  She testified that she had transportation difficulties for drug testing.  She also said she felt as though testing to prove she was clean and sober amounted to admitting that she had a drug problem, which she denied.  She understood from the child and family team meeting that a clean drug test would not change her child's placement and she would have to participate in services anyway.  Mother said she would drug test and participate in services if A.T. were placed with her and the services were mandatory.

Mother picked up referral information for services at the end of November 2021, but she had not started services at the time of the hearing in January 2022.  Mother stated she visited A.T. about 10 times in person since he was born and attended virtual visits twice a week.

Mother asked for A.T. to be placed in her care, saying he should be with his family.  She said she would participate in any recommended services if her son could be with her, including drug testing.

In rebuttal, the social worker said the caregiver reported the parents were only able to visit A.T. virtually about once per week due to connection issues.  The social worker stated she provided Mother with drug testing referrals in Mexico.  The worker also submitted referrals for transportation passes, but Mother did not pick them up.

9

The social worker expressed concern about placing A.T. in Mother's care because, without Mother's cooperation with voluntary drug testing, the Agency could not assess that there was no substance abuse occurring in the home. The only information available at the time was the positive drug test from July 2021.

After considering the evidence and the testimony, the court found jurisdiction under section 300, subdivision (b). The court found the only inference it could draw from the uncontroverted positive tests for both Mother and A.T. was that there was methamphetamine use. The court determined that there was credible evidence that the medication Mother was given at the time of delivery would not produce the positive results. The court found there was harm to the child as a result of the drug use.

The court found Mother made no progress toward alleviating or mitigating the causes necessitating placement and that there was clear and convincing evidence that A.T. should continue to be removed from Mother because there was a substantial danger to the physical health, safety, protection or physical or emotional well-being of A.T. and there was no reasonable means by which he could be protected without removal. The court ordered A.T. placed in a licensed foster home.

The court admonished mother to participate in services and of the importance of providing drug testing to get A.T. back in her care.

DISCUSSION

Mother does not challenge the juvenile court's jurisdictional finding, but contends there was not substantial evidence to support the court's removal order and that there were reasonable alternatives to removal.

Once the court exercises jurisdiction over a minor, "it must decide the appropriate disposition. Generally, the court chooses between allowing the

10

child to remain in the home with protective services in place and removing the child from the home while the parent engages in services to facilitate reunification." (*In re E.E.* (2020) 49 Cal.App.5th 195, 205 (*E.E.*).) To order removal of a child from parental custody, the juvenile court must find clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) The court must also determine if "reasonable efforts were made to prevent . . . the need for removal" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).)

"The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re D.B.* (2018) 26 Cal.App.5th 320, 328 (*D.B.*).) The court may consider the "parent's past conduct as well as present circumstances." (*Id.* at p. 332, citing *In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)

We review the court's removal order for substantial evidence, bearing in mind the heightened clear and convincing evidence standard of proof. (*In re Kristen H.* (1996) 46 Cal.App.4th 1635, 1657; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996 (*O.B.*).) The question before us is "whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true." (*O.B., supra*, at p. 1011.) We "must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the

11

evidence, and drawn reasonable inferences from the evidence." (*Id.* at pp. 1011–1012.) The "appellant has the burden to demonstrate there is no evidence of a sufficiently substantial nature to support the findings or orders." (*D.B., supra*, 26 Cal.App.5th at pp. 328–329.)

The juvenile court here considered that A.T. was less than a year old and did not have the ability to speak for himself. If A.T. were returned to the parents' care, the court stated it did "not have any evidence that the child would be adequately protected, either from substance abuse by Mother or from Father who would act to protect a child against the substance abuse or use of drugs by Mother."

Contrary to Mother's contention, the juvenile court considered alternatives to removal. The court considered Mother's request to return A.T. to her care with a family maintenance program. However, the court determined that the Agency's recommendation for continued removal was reasonable considering the positive drug tests, which were not mitigated with subsequent testing.

The court found that the "Agency exercised reasonable efforts to prevent or eliminate the need for removal by directing Mother to have drug testing. At least five tests were offered or directed, and she did not make those tests for various reasons. And since drugs are the underlying issue, it is clear to this court that . . . that issue [has] not been mitigated. And the need for removal is based on that fact." As a result, the court found there was clear and convincing evidence of a nexus between risk of harm related to drug use and lack of drug testing. Because there was no evidence Mother had mitigated this condition, there was a substantial danger to the health, safety and welfare of the child and there was no reasonable means to protect the child short of removal and placement in licensed foster care.

Substantial evidence supported the court's findings. It is undisputed that Mother and A.T.'s umbilical cord tested positive for drugs at birth. The court found the Agency presented credible evidence that the medications provided to Mother in the hospital would not result in positive tests for amphetamine or methamphetamine. The Agency also received a report that Mother was known to use substances. Mother acknowledged that she uses marijuana to help with headaches and that she tested positive for marijuana when she gave birth to another child a year earlier.

Mother agrees that this evidence supports the court's order, but claims it is not enough to support the order for removal. We disagree. The use of drugs while pregnant "unquestionably endanger[ed] the health and safety of her unborn child." (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217 (*Christopher R.*).) A parent's implausible denial of drug use during pregnancy along with resistance to monitoring and services reasonably support a finding that the parent is unable to provide a safe home for a child. (*E.E.*, *supra*, 49 Cal.App.5th at p. 215; *Christopher R.*, *supra*, at pp. 1219–1220 [persistent use of marijuana supported a finding of inability to provide care for an infant].)

Although Mother claimed she would participate in services, including drug testing, if the child were returned to her care under supervision, the court found that Mother did not have "a lot of credibility." The juvenile court was in the best position to weigh the evidence and assess Mother's credibility. It is not our role on appeal to "reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) We will uphold a juvenile court's factual determinations "even though substantial evidence to the contrary also exists

13

and the trial court might have reached a different result had it believed other evidence." (*Ibid.*)

Mother relies on *In re Ma.V.* (2021) 64 Cal.App.5th 11 (*Ma.V.*) for the proposition that the court erred in considering her failure to participate in voluntary drug tests and services. That case is not helpful for Mother. That case included allegations that the mother, who was a veteran with posttraumatic stress disorder, was involved in instances of domestic violence with a boyfriend and had a substance abuse problem with marijuana. (*Id.* at p. 14.) After the mother's children were detained, she informed the court that she was already connected to services as a veteran. She reported that she used marijuana medicinally with the approval of her Veteran's Administration (VA) providers. (*Id.* at pp. 17–18.) By the time the contested adjudication and disposition hearing was completed, approximately 10 months after detention, the mother had ended her relationship with the boyfriend and testified that she had been attending parenting, domestic violence, and individual counseling services through the VA. There was evidence that she was compliant with medication and treatment recommendations, but the agency had difficulty obtaining detailed information from the mother's VA therapist. The agency was no longer concerned that her marijuana use put the children at risk. (*Id.* at p. 19.) The juvenile court removed the children from the mother's care based on the " 'historical issue of domestic violence' and the court's finding 'there's no indication that [the] mother has dealt with this.' " (*Id.* at p. 21.)

The appellate court in *Ma.V.* determined the jurisdictional findings lacked substantial evidence because they were based on old issues that were resolved by the time of the hearing. (*Ma.V., supra*, 64 Cal.App.5th at pp. 21–23.) The appellate court also determined the evidence was insufficient under

14

a clear and convincing standard to support the removal order. The court concluded that the mother's services were voluntary and she had no obligation to complete a verified case plan because one was not yet ordered. (*Id.* at p. 24.) Nevertheless, the court observed that the mother had improved her situation during the detention period so that the earlier issues had "aged out." Although the mother was not entirely cooperative with the agency, the court observed that the "ability of a parent to get along with a social worker is not evidence from which a removal order can be supported." (*Id.* at p. 25.) Rather, it was incumbent on the agency to obtain the necessary information to confirm her participation in services. (*Id.* at p. 24.)

Here, unlike in *Ma.V.*, there was no evidence to support a claim that the detention issue had aged out. Because Mother resisted or declined multiple opportunities provided by the Agency to provide a negative drug test the court had only the uncontroverted positive drug tests to evaluate. Based on this information the court stated, "the only inference that I can draw is there was use." Although Mother claimed she attempted to test when she got a referral for testing in Mexico, she also said she did not want to test because she thought it was an admission of a drug problem. The court could reasonably disbelieve Mother's explanations. Mother's continued denial of drug use in the face of positive drug tests and evidence that she was a known substance user along with her unwillingness to test or participate in voluntary treatment supported the court's determination that there was no alternative to removal, particularly for a child who was under a year old. (§ 361, subd. (c)(1); *In re Lana S.* (2012) 207 Cal.App.4th 94, 105–106.)

Mother also contends that the court improperly shifted the burden to Father to show his home was safe for placement. We again disagree. Before making its findings, the court made some comments about the difficulty of

obtaining information when it had no control over the agencies in Mexico and the fact that Father did not help the court by taking any proactive steps to provide the court with information about the state of the home, such as providing pictures. We construe these comments as what the court stated them to be, an advisory digression, not a basis for the court's order. As the Agency points out, Father had only recently been confirmed as the biological father. His status was not elevated to presumed and the Agency had no burden to show why removal from him was necessary. (§§ 361.5, subd. (a); 361, subd. (c)(1)(B); *In re Zacharia D.* (1993) 6 Cal.4th 435, 448–449.)

Finally, Mother contends the court erroneously relied on the alleged prior removal of other children and what it termed to be an "open case" involving another child to support its removal finding. The court acknowledged that it did not have full information about whether she had voluntary cases in the past or lost other children "who were removed for unknown reasons," but commented that there was a "pattern" that "prior children have suffered under the care – or been removed for reasons that can only be described as adverse to their best interest, so they were removed." The record shows, and Mother admitted, that she had prior referrals to child welfare service agencies and that at least two children were now living in another state in the care of an older sibling. There were also referrals for a child about a year older than A.T. that were closed by another county as inconclusive. The court's comments appear to be in the context of why it did not find credible Mother's claims that she would do everything the court mandated her to do if A.T. were returned to her.

Even if the court relied on these prior referrals, any error was harmless because the court's focus was on the evidence of unmitigated drug use, which we have concluded was alone sufficient to support the court's removal

16

finding.  It is not reasonably probable that the court would have made a different finding even without considering the prior referrals.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

DISPOSITION

The order is affirmed.

O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


AARON, J.